IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2011 MAR 31  P 3: 01

CLERK'S OFFICE
AT GREENBELT

BY ICRC DEPUTY

| | |
|---|---|
| DOUGLAS HOSACK,<br>1330 New Hampshire Ave NW Apt 207<br>Washington, DC 20036<br><br>    Plaintiff,<br><br>v.<br><br>UTOPIAN WIRELESS CORPORATION<br>7910 Woodmont Avenue, Suite 1400<br>Bethesda, Maryland 20814<br><br>Serve:  Rudolph J. Geist, Chairman and CEO<br>        7910 Woodmont Avenue, Suite 1400<br>        Bethesda, Maryland 20814<br><br>and<br><br>RUDOLPH J. GEIST<br>7907 Glenbrook Road<br>Bethesda, Maryland 20814<br><br>    Defendants. | Civil Action No.: __DKC 11 CV 0858__ |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Douglas Hosack ("Plaintiff"), provides as follows for his Complaint against nominal Defendant Utopian Wireless Corporation ("Utopian"), and Defendant Rudolph J. Geist ("Geist").

## NATURE OF THE ACTION

1.    This is a derivative action arising out of the failure of the board of directors of Utopian to take actions to collect and retain repayment of a one million dollar ($1,000,000) insider loan from Utopian to Geist (the "Loan").

2.      Utopian is in dire need of funding, but rather than pay back his Loan, Geist has caused Utopian to solicit further investment by current stockholders (the "Second Solicitation"), with a 95% dilution of any stockholders unwilling or unable to commit to participation within five (5) business days of receipt of the Second Solicitation.

3.      The disclosure letter accompanying the Second Solicitation failed to disclose the existence of the Geist's outstanding Loan as well as other material facts, and such disclosure violations in relation to stock rights constitute *per se* irreparable harm under the law of Delaware, Utopian's state of formation.

4.      This emergency equitable action is being undertaken by Plaintiff as a stockholder of Utopian to prevent the imminent, substantial and  irreparable harm threatened by the Geists to Utopian and its stockholders.

## THE PARTIES

5.      Plaintiff is an adult resident of the District of Columbia, a member of the Maryland Bar, the third largest stockholder of Utopian behind the Geist and Geist's wife, and a former board member and executive of Utopian.

6.      Nominal Defendant Utopian is a Delaware corporation headquartered and conducting business activities in the State of Maryland.  Utopian's principal place of business is located in Montgomery County at 7910 Woodmont Avenue, Suite 1400, Bethesda, Maryland 20814. Utopian holds and leases broadband wireless spectrum rights in the 2.5 GHz EBS/BRS spectrum band regulated by the Federal Communications Commission ("FCC").

7.      Defendant Geist is an adult citizen of Maryland domiciled at 7907 Glenbrook Road, Bethesda, Maryland 20814.  Geist is the Chairman, CEO, and largest stockholder of

Utopian. He is an attorney and, on information and belief, an active member of the Bar of the District of Columbia, and an inactive member of the Bar of the Commonwealth of Pennsylvania. Geist is married to Utopian's CFO, another member of Utopian's three-member board of directors, and thereby he and his spouse control Utopian's board.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this matter and personal jurisdiction over the Defendants pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-102(a) because Nominal Defendant Utopian maintains its principal place of business in Maryland, and Defendant Geist is domiciled in Maryland.

9.    Venue in this Court is proper pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-201(a) because Utopian maintains its principal office in Montgomery County, Maryland and Geist is a resident of Montgomery County, Maryland.

## FACTS

10.    Utopian loaned a million dollars to Geist on or about March 12, 2009, pursuant to a promissory note and security agreement drafted by Geist. These two documents describe the Loan. *The Loan documents are attached hereto as Exhibit 1.*

11.    Prior to the Loan's execution, when Plaintiff expressed concern to Geist in Geist's office over the limited recourse provisions of the Loan, Geist became enraged and hit a metal stapler on Geist's desk so hard that the stapler dented a metal filing cabinet ten feet away, thereby physically intimidating Plaintiff. This particular incident was referenced in the unemployment insurance claim Board of Appeals decision of Clare C. Liedquist ("Liedquist"), a stockholder and former employee of Utopian. Specifically, the decision stated that Geist "threw a stapler in a fit

of rage in the office in the presence of the claimant." *This DLLR Board of Appeals decision is attached hereto as Exhibit 2.*

12.   Plaintiff left Geist's office after the physical intimidation and returned to his own office. Soon thereafter, Geist came into Plaintiff's office and informed Plaintiff that Plaintiff was fired, and told Plaintiff "go ahead and sue me."

13.   Under the distress of Geist's physical intimidation as well as the fear of unemployment, Plaintiff capitulated to Geist's coersion and Geist's demand that Plaintiff execute the Loan on behalf of Utopian as its Chief Operating Officer. Plaintiff also capitulated to Geist's demand that Plaintiff introduce the written consent of the directors approving the transaction in a telephonic meeting with Gregory Rohde, the only other board member outside of Geist, Geist's wife and (at that time) Plaintiff.

14.   The ongoing duress imposed by Geist on his employees including Plaintiff is evidenced by the finding of fact of an administrative law judge in Liedquist's unemployment appeal process that "Rudy Geist engaged in erratic and belligerent behavior, often screaming profanity at employees and threatening to fire them. In one instance he threw a pen at the claimant when she asked him a question. He also canceled payment for the claimant's client security fund required for bar membership. He also held grudges and retaliated against employees who questioned him." *This Unemployment Insurance Appeals Decision is attached hereto as Exhibit 3.*

15.   In 2010, Utopian was awarded over to eight million dollars ($8,000,000) in grants and over two million dollars ($2,000,000) in loans under the Broadband Initiatives Program of the Rural Utility Service of the Department of Agriculture (the "RUS Funding) pursuant to the

American Recovery and Reinvestment Act of 2009.

16.     On November 5th, 2010, Plaintiff took action to ensure false certifications were not filed in connection with with Utopian's RUS Funding. This action was in direct defiance of Geist's instructions to Plaintiff.

17.     Plaintiff's employment terminated eight business days later on November 18th, 2010 after Geist told Plaintiff "I want you gone. I want you out of here. You can't be trusted."

18.     Plaintiff has separately filed suit (the "Hosack Lawsuit") alleging wrongful termination with respect to his November 18th, 2010 termination, along with other causes of action, against Utopian, Geist, and related parties.

19.     After Plaintiff's employment was terminated, Utopian contested Plaintiff's unemployment insurance claim. Consequently, Plaintiff currently has no significant source of income.

20.     As of November 18th, 2010 when Plaintiff's employment terminated, Geist had not repaid any part of the Loan.

21.     On January 25, 2010, Plaintiff received a Notice of Preemptive Rights and accompanying Preemptive Rights Notice and Disclosure Letter together soliciting the sale of additional Utopian stock to current stockholders of Utopian (together, the "Initial Solicitation"). The Initial Solicitation did not specify a price per share. T*he Initial Solicitation is attached hereto as Exhibit 4.*

22.     In response to the Initial Solicitation, Plaintiff made a written demand (the "Stockholder Demand") of the Utopian Board that it refrain from soliciting investment-- particularly from Geist-- until the Geist Loan has been repayed. *Plaintiff's Stockholder Demand*

*Letter is attached hereto as Exhibit 5.*

23.    On Monday, February 21, 2011, Plaintiff received an amended Notice of Preemptive Rights and accompanying Preemptive Rights Notice and Disclosure Letter together soliciting the sale of additional Utopian stock to current stockholders of Utopian. These two documents comprise the Second Solicitation. *See the Second Solicitation attached hereto as Exhibit 6.*

24.    The Second Solicitation evinces a state of Utopian's insolvency or near insolvency. It states:

> Since November 2010, Utopian has been surviving on funds drawn on a limited line of credit made available to the Corporation from Morgan Stanley Inc., which was provided solely due to the personal guarantee of Rudolph J. Geist, Utopian's CEO and principal stockholder. To date, Utopian has drawn down $350,000 on the line of credit. The line of credit is subject to cancellation at any time upon notice from Morgan Stanley for any reason or no reason, or in the event Mr. Geist withdraws the guarantee. Mr. Geist has notified Utopian that he will be withdrawing the guarantee.

25.    The Second Solicitation further states that "For over a year, Utopian has attempted unsuccessfully to secure permanent funding to cover the additional sums needed for continuing operations..." and  that if Utopian fails to raise at least $500,000 from the Second Solicitation, "the Corporation will be forced to immediately and completely discontinue operations."

26.    On information and belief based upon the Second Solicitation, Geist has not repaid any of the Loan to date, in spite of Utopian's apparent need and Geist's promise pursuant to the Loan promissory note "to repay the Principal Loan Amount... at the earlier of: ... (2) the date on which the Lender [Utopian] has available a total cash balance in all its accounts of less than $50,000 and requires additional cash funding for continued operational expenses."

27.     The Second Solicitation fails to state the existence of the Loan and Geist's refusal or failure to repay it.

28.     The Second Solicitation does not include any balance sheet, profit and loss statement, cash flow statement or other financial statements on which Stockholders can weigh the risks of investment.

29.     The Second Solicitation does not state the extent of Utopian's potential liabilities, including: (a) how much money is owed on existing lease agreements, (b) whether any lease agreements are in payment default and to what extent, (c) the amount of the potential judgment against Utopian in Plaintiff's wrongful termination lawsuit, (d) the extent of potential liability from lawsuits by Utopian's wireless spectrum lessors in the event Utopian fails to use their spectrum to meet the "substantial service" requirements by May 1st, 2011 and the licenses are terminated as a result, (e) the pro rata share of costs Utopian will have to reimburse to Clearwire Corporation and other proponents of the EBS/BRS spectrum band transition as required by 47 C.F.R. § 27.1237.

30.     The Second Solicitation does not advise on the status of negotiations with Motorola Mobility, Inc and/or Motorola Solutions, Inc., successors in interest of Motorola, Inc. Motorola, Inc. was specified in Utopian's RUS Applications as the party constructing the funded wireless networks, but as of Plaintiff's employment termination on November 18th, 2010, no finalized agreement between Motorola, Inc. and Utopian had been executed.

31.     Although the Second Solicitation states that "failure to comply with the May 1, 2011 Substantial Service deadline subjects those FCC licenses that Utopian leases to automatic cancellation, which would result in the total loss of those spectrum leases, which constitute

Utopian's principal assets", the Second Solicitation does not indicate the time frame to construct "Substantial Service" and whether this is even possible with only two months until the Substantial Service deadline. The imminent, total loss of Utopian's principal assets—valued at tens of millions of dollars-- within two months underscores the urgency of this matter and supports the need for the extraordinary judicial intervention requested in this Complaint.

32.    In spite of the million dollars owed by Geist to Utopian pursuant to the Loan, the over 10 million dollars in RUS Funding committed to Utopian, and the spectrum sale transaction described in the Second Solicitation as "anticipated to provide the Corporation with net proceeds of $1.88 million", the Second Solicitation states "The conversion price per share ($0.05/share) is based on a pre-money valuation of the Corporation of $246,500, which your Board of Directors has determined is a reasonable estimate of the value of the Corporation if the Bridge Funding is not successfully concluded..."

33.    In spite of the security agreement of the Loan stating that "the fair market value of the common shares of Secured Party for the purpose of determining value of the collateral pursuant to this Security Agreement and Promissory Note at any time shall not be less than $4.00 per share [for the purpose of foreclosing on Utopian shares held by Geist]", the Second Solicitation values Utopian shares at $0.05 per share.

34.    The discrepancy between share valuations between the Loan documents and the Second Solicitation will-- in the absence of judicial intervention-- enable Geist to retain Utopian's million dollars in exchange for foreclosure of only 250,000 of Geist's Utopian shares and use part of that money to purchase 14,034,483 shares together with his wife pursuant to the Second Solicitation. This transaction would result in a net transfer of over 13 million shares of

Utopian to Geist and his wife for no net benefit to Utopian. By way of comparison, only 5 million shares are currently held by all Utopian stockholders combined.

35.     No other stockholder received the benefit of a personal loan from Utopian.

## CAUSES OF ACTION

## COUNT I – Temporary Restraining Order against a Private Placement pursuant to the Second Solicitation

36.     The allegations contained in all preceding paragraphs are incorporated herein.

37.     Pursuant to Maryland Rule 15-504(a), a temporary restraining order may be granted only if it clearly appears from specific facts shown by affidavit or other statement under oath that immediate, substantial, and irreparable harm will result to the person seeking the order before a full adversary hearing can be held on the propriety of a preliminary or final injunction.

38.     If the private placement solicited by the Second Solicitation proceeds, immediate, substantial, and irreparable harm will occur to Utopian stockholders due to breach of the Utopian's board's duty of disclosure when seeking stockholder action. Specifically, non-participating Utopian stockholders will be harmed by dilution of their ownership in Utopian, and participating Utopian stockholders will be harmed by investing without full and fair disclosure of all material information, including the information referenced in paragraphs 27 through 31 of this Complaint (such information hereafter referred to as the "Material Information").

39.     The immediacy of the harm is clearly shown by the Second Solicitation itself, which states "Utopian requires that you indicate your willingness to purchase Convertible Notes no later than February 28, 2011", which was yesterday.

40.     The substantialness of the harm is explicitly stated by the Second Solicitation,

which states "IF YOU ELECT NOT TO PURCHASE THE CONVERTABLE NOTES, YOUR EQUITY IN UTOPIAN WILL BE SUBJECT TO SUBSTANTIAL DILUTION."

41.     With respect to the element of irreparable harm, the failure of the Final Solicitation to disclose the Material Information in seeking stockholder action to exercise or refrain from exercising stockholder preemptive rights constitutes irreparable harm *per se*, since under Delaware law, "directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks stockholder action." *Stroud v. Grace*, 606 A.2d 75, 84 (Del. Supr., 1991) and "this Court has explicitly held that a breach of the disclosure duty leads to irreparable harm." *In re Transkaryotic Therapies, Inc.*, 954 A2d 346, 361 (Del. Ch., 2008).

42.     Maryland Rule 15-503(c) states that on request, the court may dispense with the requirement of surety or other security for a bond if it is satisfied that (1) the person is unable to provide surety or other security for the bond, (2) substantial injustice would result if an injunction did not issue, and (3) the case is one of extraordinary hardship.

43.     Plaintiff is unable to provide surety of the magnitude of the $500,000 to $1,100,000 million in funding sought by Utopian, and hereby requests a waiver of the surety requirement on the grounds that Plaintiff has no significant source of income due to actions taken by Utopian leading to Plaintiff's employment termination and denial of unemployment insurance benefits.

44.     As detailed in the various counts of this Complaint, substantial injustice will occur if the injunctions against Utopian and its management are denied based upon the economic hardship of Plaintiff created by Utopian and its management.

45.     In light of the short five (5) business day response period, Plaintiff has been unable to retain legal counsel experienced in stockholder rights and securities litigation of the nature of this case. This rushed timeframe, coupled with Plaintiff's current economic hardship together represent extraordinary hardship with respect to Plaintiff's ability to protect the rights of Utopian's minority stockholders including himself.

### COUNT II – Temporary Restraining Order against Cancellation of Line of Credit

46.     The allegations contained in all preceding paragraphs are incorporated herein.

47.     The Second Solicitations states that "Since November 2010, Utopian has been surviving on a limited line of credit made available to the Corporation from Morgan Stanley" (the "Line of Credit"), therefore a cancellation of the Line of Credit prior to the securing of other funding by Utopian is a harm that threatens Utopian's very survival.

48.     The immediacy of this harm stems from the Line of Credit's possible cancellation at any time by Morgan Stanley, and Mr. Geist's notice to Utopian that he will be withdrawing the guarantee.

49.     As this harm threatens Utopian's very survival, it would be both substantial and irreparable.

### COUNT III – Injunction against Second Solicitation Pending Full Disclosure

50.     The allegations contained in all preceding paragraphs are incorporated herein.

51.     Pursuant to Maryland Rule 15-502(b), "the court, at any stage of an action and at the instance of any party or on its own initiative, may grant an injunction upon the terms and conditions justice may require."

52.     As a general rule, the appropriateness of granting an interlocutory injunction is

determined by examining four factors: (1) the likelihood that the plaintiff will succeed on the merits; (2) the "balance of convenience" determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal; (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest. *Department of Transp., Motor Vehicle Admin. v. Armacost*, 299 Md. 392, 404 (Md., 1984).

53.     Having made a proper Stockholder Demand of the Utopian's Board, Plaintiff will succeed on the merits of this derivative action as the Second Solicitation on its face does not contain the Material Information.

54.     The injury to Utopian upon grant of this injunction "pending full disclosure" would be slight in that Utopian could immediately issue a further amended notice containing full disclosure of all Material Information. Conversely, the potential injury to Utopian upon denial of this injunction might be substantial in terms of future liability to investors based on omissions of material facts from the Second Solicitation in the event these investors lose value.

55.     As explained earlier, the omission of the Material Information from the Second Solicitation is *per se* irreparable under Delaware law.

56.     The public interest, as expressed in Federal and state securities law, to protect investors is served by enjoining the sales of securities pursuant to the incomplete information contained in the Second Solicitation.

## COUNT IV – Injunction against Cancellation of Line of Credit pending Full Repayment of Loan

57.     The allegations contained in all preceding paragraphs are incorporated herein.

58.     Plaintiff will succeed on the merits, as the interests of justice and the public

interest require that Geist not be allowed to "strangle" Utopian by withholding Loan repayment and canceling the Line of Credit in order that Geist may justify a subsequent Utopian investment premium based on the dire financial circumstances of Utopian that Geist's own actions created.

59.     Denial of this injunction will allow Geist to cancel the Line of Credit, and thereby threaten the greatest possible harm to Utopian's very survival, as explained earlier. On the other hand, grant of the injunction only puts Geist at risk for monetary value up to an amount that he already owes Utopian pursuant to the Loan.

60.     Cancellation of the Line of Credit would irreparably harm Utopian's survival.

### COUNT V – Injunction against Geist Participation in Financing of Utopian pending Full Repayment of Loan

61.     The allegations contained in all preceding paragraphs are incorporated herein.

62.     Plaintiff will succeed on the merits, and the public interest will be served, for the same interest of justice rationale as expressed for Count IV.

63.     Denial of this injunction will allow Geist to wrongfully use the Loan proceeds to dilute non-participating stockholders who did not have the benefit of such a personal loan from Utopian. On the other hand, grant of the injunction only puts Geist at risk for dilution in the event Utopian still moves forward with its equity fund raising before Geist can repay his Loan.

### COUNT VI – Equitable Appointment of Receiver

64.     The allegations contained in all preceding paragraphs are incorporated herein.

65.     Under the law of Delaware, the state of Utopian's formation,

> Whenever a corporation shall be insolvent, the Court of Chancery, on the application of any creditor or stockholder thereof, may, at any time, appoint 1 or more persons to be receivers of and for the corporation, to take charge of its assets, estate, effects, business and affairs, and to collect the outstanding debts,

claims, and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation or otherwise, all claims or suits, to appoint an agent or agents under them, and to do all other acts which might be done by the corporation and which may be necessary or proper. The powers of the receivers shall be such and shall continue so long as the Court shall deem necessary. 8 Del. C. 1953, § 291;

66.     Delaware law also supports the discretionary appointment of a receiver in the case of a controlling stockholder engaging in self dealing and deceptive conduct. See, e.g. *Production Resources v. NCT GROUP*, 863 A.2d 772 (Del. Ch., 2004).

67.     Geist used his influence as Utopian's Chairman and CEO to cause Utopian to loan him a million dollars-- with Utopian's only recourse to reclaim Geist's shares at $4 per share-- then willfully breached his obligation to repay this money-- thereby creating Utopian's current dire financial circumstances.

68.     Geist is now using his influence as Utopian's Chairman and CEO to cause Utopian to give him the opportunity to use this loaned money to buy Utopian stock at $0.05 per share.

69.     The omission of any mention of the Geist Loan from the Second Solicitation, even after receipt of the Stockholder Demand regarding the outstanding Loan and its omission from the Initial Solicitation gives rise to the inference that Geist is engaging in deceptive conduct with respect to Utopian's minority stockholders.

70.     Plaintiff hereby applies to this Court to appoint a receiver for Utopian based upon Utopian's state of insolvency as expressed in the Second Solicitation, or based on Geist's engaging in self dealing and deceptive conduct.

## COUNT VII – Equitable Appointment of Independent Attorney

71.     The allegations contained in all preceding paragraphs are incorporated herein.

72.     In light of the tight time frame before irreparable harm, Plaintiff was forced to initiate this action with an emergency motion for temporary restraining order accompanied by this Complaint hastily prepared by Plaintiff.

73.     Plaintiff has never practiced law as a litigator, and his lack of expertise in these complicated areas of corporate and securities law may prejudice the shareholder beneficiaries of this action.

74.     Plaintiff has never practiced law independently, and therefore does not carry malpractice insurance.  This represents an unreasonable risk to the Plaintiff to the extent he may be deemed counsel in this action rather than a *pro se* litigant.

75.     Continued representation by Plaintiff as an attorney in this case beyond what is absolutely required to prevent imminent, irreparable harm may not be appropriate in light of his role as a material witness, as well as his proprietary interest in the outcome of the case, and his participation as Plaintiff in a separate direct lawsuit against Utopian and Geist.

76.     The attorneys representing both Utopian and Geist as defendants in the Hosack Lawsuit would not be appropriate to represent Utopian in this matter given their concurrent representation of Geist.

77.     In light of the forgoing facts and circumstances, the interests of justice would best be served by the immediate appointment of an independent attorney knowledgeable in derivative lawsuits to represent the interests of the shareholders of Utopian until such time as a receiver is appointed, and a standing order for Utopian to pay the reasonable costs and fees of this attorney.

## COUNT VIII – Equitable Rescission of Loan Agreement

78.     The allegations contained in all preceding paragraphs are incorporated herein.

79.     Contracts executed under duress are void under Maryland law and subject to

recission. In *Central Bank v. Copeland*, the Court stated:

> The element of obligation upon which a contract may be enforced springs
> primarily from the unrestrained mutual assent of the contracting parties, and
> where the assent of one to a contract is constrained and involuntary, he will not be
> held obligated or bound by it. A contract, the execution of which is induced by
> fraud, is void, and a stronger character cannot reasonably be assigned to one, the
> execution of which is obtained by duress. Artifice and force differ only as modes
> of obtaining the assent of a contracting party, and a contract to which one assents
> through imposition or overpowering intimidation, will be declared void, on an
> appeal to either a court of law or equity to enforce it. The question, whether one
> executes a contract or deed with a mind and will sufficiently free to make the act
> binding, is often difficulty to determine, but for that purpose a court of equity,
> unrestrained by the more technical rules which govern courts of law in that
> respect, will consider all the circumstances from which rational inferences may be
> drawn, and will refuse its aid against one who, although apparently acting
> voluntarily, yet, in fact, appears to have executed a contract, with a mind so
> subdued by harshness, cruelty, extreme distress, or apprehensions short of legal
> duress, as to overpower and control the will. *Central Bank v. Copeland*,18 Md.
> 305, 317 (1862).

80.     *Eckstein v. Eckstein*, 379 A.2d 757, 38 Md.App. 506 (Md. App., 1978) cites to

elements listed in the  Restatement (Second) of Contracts to determine when a threat is improper

and may constitute duress: "A threat is improper if the resulting exchange is not on fair terms,

and (a) the threatened act would harm the recipient and would not significantly benefit the party

making the threat, or (b) the effectiveness of the threat in inducing the manifestation of assent is

significantly increased by prior unfair dealing by the party making the threat, or (c) what is

threatened is otherwise a use of power for illegitimate ends."   The Loan meets these elements, in

that Utopian gave up a million dollars in value for essentially no benefit through the Loan

transaction wherein Geist engaged in physically threatening behavior towards Plaintiff, and further threatened to fire Plaintiff (or alternately, to refuse to recant his firing of Plaintiff.)

81.     Even if the actions of Geist in securing the loan do not amount to duress in the opinion of the Court, his position as Plaintiff's employer and his willingness to coerce Plaintiff's capitulation through wielding his power to fire Plaintiff constitute undue influence under Maryland law. "The influence which the law condemns as undue is that which is operative to such a degree as to amount in effect to coercion." *White v. Bramble*, 124 Md. 395, 400, 92 A. 763, 765 (1914).

82.     Finally, the Loan, and specifically the term of the Loan drafted by Geist limiting Utopian's recourse to foreclosure of Geist's stock in Utopian at the grossly inflated valuation of $4 per share constitutes self-dealing and a violation of Geist's fiduciary duty of loyalty to Utopian's stockholders.   The legal concept of substantive unconscionability is meant to counteract abuses which relate to the substantive contract terms themselves and "whether those terms are unreasonably favorable to the more powerful party, such as terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law..." *Walther v. Sovereign Bank*, 872 A.2d 735, 744 (Md., 2005) *quoting* Richard A. Lord, *Williston on Contracts* § 18:10 (4th ed. 1998).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)     Issue a temporary restraining order enjoining the officers and board of directors of

Utopian from soliciting or retaining any investment in Utopian Wireless Corporation pursuant or related to the Second Solicitation until a full adversarial hearing is conducted with respect to the adequacy of the disclosures in the Notice.

(b)     Issue a temporary restraining order enjoining Geist from withdrawing the security of the Line of Credit, or taking any other action, directly or indirectly, to cause this Line of Credit to be cancelled until a full adversarial hearing is conducted with respect to the propriety of Geist taking such action while the Loan is outstanding.

(c)     Issue an injunction enjoining the officers and directors of Utopian from soliciting investment via any means which fails to disclose all Material Information.

(d)     Issue an injunction enjoining Geist and his affiliates from contributing funding to Utopian as part of any equity, debt, or other fund raising for Utopian until the Geist Loan is repaid in full.

(e)     Appoint a receiver of Utopian to take such actions as advisable to collect on the Loan, and to use the line of credit as necessary to sell Utopian's spectrum assets before they become worthless and to otherwise raise additional funding to protect Utopian's spectrum assets from forfeiture and unlock the RUS Funding as in the best interest of the Stockholders of Utopian.

(f)     Appoint an independent attorney to litigate this action on behalf of Utopian, and issue an order for Utopian to pay the reasonable costs and attorney's fees incurred.

(g)     Issue a declaratory judgment to rescind the Loan agreement and order Geist to immediately repay Utopian the amount loaned.

(h)     Grant Plaintiff a waiver of all requirements for Plaintiff to provide surety for the

equitable actions requested herein.

     (i)    Order Utopian to reimburse Plaintiff his reasonable attorney's fees and costs in

pursuing this action; and

     (j)    Order such other and further relief as this Court deems appropriate.

## **VERIFICATION**

I, Douglas A. Hosack, solemnly affirm under the penalties of perjury that the contents of the foregoing Complaint are true to the best of my knowledge, information, and belief.


Dated: March 1, 2011

                                                 Respectfully submitted,

                                                 Douglas A. Hosack